Casey, C. J.,
delivered the opinion of the Court.
On the 9 th of February, 1855, Colonel William Turnbull, who was in charge of the improvement of the harbors in the northern lakes, concluded a contract with the claimants for the delivery of the following materials at the harbor of Dunkirk, New York, viz :
“ 1, 054 pieces hemlock timber, 30 feet long........ 12x12
918 pieces do do 20 do 12x12
204 pieces pine do 30 do 12x12
204 pieces do do 20 do 12x12
51 pieces oak do 30 do 12x12
51 pieces do do 30 do 12x12
68 pieces do do 30 do 12x6
5 pieces do do 10 do 16x16
*53 24, 650 feet, board measure, 3-inch pine plank, 10 feet long.
4, 792 white oak treenails, 2 feet long, 2 inches square.
25, 425 lbs. round 1-inch American bolt iron.
1,159 lbs. wrought 6-inch spikes.
1,190 cords stone.
“ The whole of the timber to be hewn square, and free from sap, shakes, and other imperfections, and to be delivered as follows :
“ One-half of the hemlock timber to be delivered on the first day of May, and one-half on the first of July, 1855. One-half of the pine timber to be delivered on the first day of June, and one-half on the first day of July, 1855; and the whole of the oak timber to be delivered on the first day of August, 1855.
“ One-half of the white oak treenails to be delivered on the first day of May, and one-half on the first day of June, 1855. One-half of the iron to be delivered-on the first of May, and one-half on the first of June, 1855. The stone to be delivered as follows : One-third on the first of June, one-third on the first of July, and one-third on the first of August, 1855. One-half of the spikes to be delivered on the first of June, and one-half on the first day of July, 1855.
“ The articles as delivered on these several specified days to be measured and inspected by an agent of the United States, and if approved and accepted, the quantities so approved and inspected will be paid for according to contract price, less 10 per cent, on amounts due, which per cent, will be retained by the United States until the contract be completed, when amounts so retained will be paid to the contractor, or will be forfeited to the United States if the contractor fail to fulfil his contract.”
There was none of this material delivered by the time specified in the contract, and the first delivery and inspection appear to have been on the 12th July, 1855, the next on the 14th September, and the third, and last, on the 30th October, 1855.
Of the hemlock 30 feet long there then lacked 114 pieces; while of those 20 feet long there had been delivered 176 pieces in excess of the contract; of the pine timber 30 feet long there lacked 102 pieces, and of that 20 feet long 97 pieces ; of the oak there lacked 101 pieces ; of the pine plank there lacked 10,937 feet; the treenails and the iron were all delivered; of the stone there lacked 6201%45- cords.
The season was unfavorable both for prosecuting the work and for procuring material, and the claimants appear to have met with great delays and embarrassments in getting material of the right kind delivered. Some of the timber and the treenails when delivered were *54 rejected — tlie timber, a portion of it, because it was not of the required sizes, and a part because'it was not of the proper quality, and the treenails because they were sawed instead of being rived ; these had to be replaced by other timber and treenails, and occasioned some delay. It does not, however, appear from the evidence that the work was at any time delayed, by the want of any materials which the claimants had contracted to deliver. The iron and spikes were all delivered at the time the contract required. About one-half the stone and more than two-thirds of the timber were delivered, accepted and used by the government. The officers of the government in charge of the work received the stone and timber, after the time fixed in the contract for the delivery, and used them in the construction of the breakwater in the harbor.
On the lGth October, 1855, Colonel Turnbull declared the contract forfeited, and, in writing to the department notifying it of the fact, stated it was “ on account of the repeated delays and failures on the part of the contractors. ” Colonel Turnbull belonged to the engineer-corps, and was in charge of the various works being prosecuted by the United States in the State of New York, and he appears to have given but occasional personal supervision of the work at Dunkirk. Mr. William H. Pettis was the engineer, or superintendent, in charge of the work there until about the 15th of September, 1855, when he was taken to Buffalo to superintend the erection of the custom-house, and a man by the name of Thomas Forster appointed in his place; and it is evident that the forfeiture of the contract was owing- to the representations made by him to Colonel Turnbull, who appears to have been most of the time at Oswego. When the claimants were informed of the forfeiture, they prepared a careful statement of their doings under the contract, the amount of material delivered, the difficulties encountered, and the accidents and causes which prevented a full compliance within the time stipulated. Upon receipt of this statement, Colonel Turnbull recommended to the department the restoration of the contract as best and most just to both parties ; hut the Secretary of War, Jefferson Davis, refused to restore it. Application was then made to take off the forfeiture alone, but that was also refused.
The following amounts were paid to the claimants :
July 12, (as per bill stated).................... $3, 247 94¿
September 14, (as per bill stated)............... 4, 218 14
October 30, -(as per bill stated).................. 4, 440 35
11,906 43-J
*55 From each of these bills there had been deducted the 10 per cent, as stipulated in the contract, amounting in the aggregate to the sum of $1,322 93 ; and this constitutes the first three items of the plaintiffs’ claim.
Item 4. — They claim also $254 50 for moving timber from the central part of the harbor to the sand point, where they were required to deliver it before the government would receive it. They allege that they wrote to Colonel Turnbull, requesting him to designate a place or point in the harbor where the timber should be delivered, and that he failed to do so; that, in consequence of this failure, they were subjected to this additional expense in moving their timber through the harbor, encumbered as it was with ice, &c. Mr. Pettis, the superintendent, on the other hand, swears that on the 9th of April, 1855, at the order of Colonel Turnbull, he wrote to them, informing them when the materials were to be used, and where they must be delivered. Aud he states that when he arrived at Dunkirk the claimants knew where the material was to be placed, and he thinks they must have received his letter.
Item 5. — Treenails rejected, $83 31. These were rejected because they were sawed instead of being split. In that state they were, as the evidence shows, wholly unfit for the use for which they were ordered. The plaintiffs procured others in place of them, which were inspected, accepted, and included in the bills above referred to.
ItemQ*. — Timber rejected, $853 20. A portion of this timber was rejected because of deficiency in size, and part was poor in quality. It was allowed to remain in the yard instead of being removed by the claimants, and a part of it was used for blocking up the other timber while it was being hewed. Some of it was washed away, but none of it, so far as the evidence shows, was used in the work by the government.
Item 7. — Extra expense of getting larger timber than required by contract, $1,046 60. The contract required that most of the timber should be 12 by 12 inches in thickness. Finding that the timber delivered was not well squared, and so scant in size that by the time it was hewn its dimensions were too small, the superintendent required the claimants to deliver it of such size as to dress 12 by 12 inches. This they complain of as a violation of the contract, aud claim the allowance above stated for it.
Item 8. — Stone delivered on the wharf and at the quarry. When Forster was appointed superintendent, and while the contract was in *56 full force, it appears from the evidence that Forster refused to receive the stone from the claimants, but commenced getting stone from other parties, although, from the evidence of Pettis, it is clear that there were both stone and timber sufficient when he left to meet all the wants of the work during the autumn of 1855. There had been delivered at the wharf 35 cords, and there were 40 cords quarried at the quarry on the point ready to be loaded on the scow and delivered into the cribs, and 240 cords purchased from the owners of the quarry. These stones at the quarry, and the purchase of the balance, cost the claimants $556 40.
Item, 9. — Paid for assorting stone, $12 50. Forster, the agent of the United States, refused to receive a certain portion of the stone until the claimants would assort them. They had the labor performed. Pie received a few cords, and then refused to receive any more.
Item 10. — Repair of scow,!$56. Mr. Pettis made an arrangement that certain stone from the quarry on tbe point should, instead of being delivered on the wharf, be delivered in the cribs, he furnishing a government scow for their transportation. When Mr. Forster became superintendent he still required the delivery of the stone in the cribs, but refused to furnish the scow. The|claimants then obtained a scow belonging to the New York and Erie Railroad Company, and had it repaired at a cost of $56. The contract did not require them to deliver the stone in the cribs, and they might, when he refused to furnish the scow, have delivered the stone on the wharf.
Item 11. — 35 cords stone, $277 90. This item is charged twice, and is not sustained by the evidence, and is part’of the stone at the quarry and on the wharf.
Item 12. — 13 cords of stone delivered in cribs,[$103 22. Mr. Pettis says he made a measurement and calculation as the basis of settlement or payment for the stone, and that they were allowed in full. It is claimed upon the testimony of W. B. Redington, who swears that there were 13 cords of stone delivered in the cribs which were not paid for, but gives no circumstances of time, place, or why these 13 cords were omitted, so as to raise a doubt about his accuracy on this point.
Item 13. — Loss on timber bargained for, $1,106. The claimant had bargained for this timber with Wm. Quidor, and had paid him for it, except $432 60; but the amount which they paid him does not appear. At the prices which they were to receive under the contract it would have amounted to $1,538 60. When the contract was forfeited they *57 settled witli Quidor by allowing him to keep what they had paid him and the timber besides, and they claim the difference as their loss or damage for the recision of the contract.
Item 14. — Loss of stone provided for delivery, $2,213 20. This item has reference to the stone (240 cords) contracted for, and of which 40 cords were quarried. This item claims for 40 cords quarried and 240 cords contracted for the full contract price, the same as if the stone had been delivered. Mr. Redington says in his testimony they cost the claimants, in advance, the sum of $556 40. x
The whole claim made up of these items is $7,793 31.
From the loose and imperfect manner in which the ease is presented in the brief of the claimants it is somewhat difficult to tell upon what grounds the recovery is rested. As near asTean ascertain, there are three classes of items :
1st. The ten per cent., which is claimed on the grounds : 1st, that the forfeiture or annulment of the contract was unauthorized and without any adequate cause to justify ú; 2d, that the officers of the government received the material and used them after the time fixed for the delivery, and therefore no forfeiture could be declared in reference to them; 3d, that they were not delivered and received under the contract, or subject to the clause of forfeiture.
2d. For material delivered, used, and not paid for.
3d. Damages for refusal to receive the balance of the material, and for the recision of the contract.
1. The first question raised by this statement of facts is, whether the retained percentage maybe recovered in this action. The United States claim that it became forfeited on the failure of the claimants to fulfil their contract, when it was declared at an end by Colonel Turn-bull on the 16th October, 1855. The contract,.as recited above, says this “ per cent, will be retained by the United States until the contract be completed, when amounts so retained will be paid to the contractor, or will be forfeited to the United States if the contractor fails to fulfil his contract.” The object of this retention is doubtless twofold — as a penalty upon the contractor for breach of the contract, and indemnity to the United States for the damages they may sustain in consequence of that breach. When it is inflicted as a punishment or penalty, it is in the nature of a forfeiture for condition broken. In enforcing forfeitures the law requires great strictness, not only of proof that the condition has been broken, but that it has been promptly availed of by the party for whose benefit it was introduced, and that *58 he has done no act, between the time of condition broken and forfeiture declared, recognizing the continued existence of the former relations. Any such act, subsequent to the breach of condition, and with knowledge of it, is considered a waiver of the right to take advantage of such breach, and a condonation of the offence, which prevents the party from afterwards insisting upon the forfeiture. Forfeitures are not favored in law, and he who insists upon them must show a clear right to demand them, and even then the law will seize hold of slight circumstances to show that the right was waived —(5 Cow. 448 ; 1 H. Bl’k, 311; 6 T. R., 320 ; Ad.Eq.,160; 1 Sauud., 287, note 16; 1 Ball & Beat., 554; Woodf., Tand. and Ten., 213; 3 T. R., 162; 3 Launt., 78; Cro. Car., 233 ; Cowp., 243.)
Where a life policy was subject to a condition making it void if the assured went beyond the limits of Europe without license, and an assignee of the policy, on paying the premium to a local agent of the company at the place where the insurance had been effected, informed him that the assured was resident in Canada, but the agent stated that this would not avoid the policy, and he continued to receive the premiums until the assured died, it was held that the company was precluded from insisting on the forfeiture—(Wing v. Harvey, 5 De G. M. & 6., 265; 2 Sto. Eg., § 1,325 a; Henry v. Tapper, 29 Vermt., 358; 20 Id., 421.) So if a lessee covenant not to underlet without the consent of the lessor under his hand and seal, with a right of reentry in case of a breach of the condition, acceptance by the lessor of rent due after condition broken, with notice of the breach, is a waiver of the forfeiture. — (Gooright ex dem. Walter v. Davids, Cowp., 803.)
In the case in hand, when the time for the delivery of the material had elapsed, and the claimants being in arrear, the officers of the government might have declared the contract at an end. In that event the ten per cent, due on that part which had been delivered would probably have been forfeited. But when the forfeiture was waived by receiving a large part of the material after the time fixed for its delivery, and encouraging and inducing the claimants to enter into new arrangements, and incur additional responsibilities on the faith of that waiver, they cannot resume their right at pleasure and insist upon its enforcement.
It may be doubted, too, whether, under the terms used, and the construction given by the parties themselves, that time was of the essence of the contract, or whether there existed at any time such a state of facts as would have sustained the forfeiture insisted on. *59 The terms used aro, “ the quantities so approved and inspected will be paid for according to contract price, less ten per cent, on amounts due, which per cent, will be retained by the United States until the contract be completed, when amounts so retained will be paid to the contractor, or will be forfeited to the United States if the contractor fail to fulfil his contract.” If the claimants had abandoned the contract, or had refused to deliver the materials required, the condition would have been broken, and the United States might most justly and reasonably have insisted upon the forfeiture. But nothing of this kind appears in the facts of this case. On the contrary, the evidence shows that they were making an earnest effort to procure the materials, and their want of better success was evidently more owing to their lack of experience in that department of business, than to any indisposition to meet the requirements of their contract.
It has been suggested for the United States, that the ten per cent, retained here was to be considered as liquidated damages for nonfulfilment. Whether the sum stipulated to be paid upon breach of the agreement is to be taken as liquidated damages, or only as a penalty, depends upon the intention of the parties, to be ascertained by a fair and just interpretation of the contract. The law regards neither penalties nor forfeitures with favor, and equity relieves against them wherever it would be unjust or unconscionable to enforce them. (2 Green, Ev., § 257; Tayloe v. Sandiford, 7 Wheat., 17; Davis v. Denton, 6 B & C., 224; Kemble v. Farren, 6 Bing., 141; 2 Sto. Eq., § 1,318.)
Beading this agreement in the light of the authorities, and applying the tests and rules by which penal clauses and liquidated damages are distinguished, we cannot perceive any intention of the parties to make the ten per centum a stipulated compensation for any breach of the contract. There can be no doubt that in addition to being reserved, and to become the subject of forfeiture in a certain event, it was also intended as a security for performance, and the means of compensation or indemnification to the United States for any damage resulting from the failure of the claimants. If any such damage resulted in this case, it has not been shown in the evidence, and we must therefore assume that none accrued.
Upon every view that we have been able to take of this subject, we are of opinion that the claimants are entitled justly and fairly to recover this retained percentage, amounting to ($1,322 93) thirteen hundred and twenty-two dollars and ninety-three cents.
Mr. R. H. Dcell for the claimants.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
2. If the ten per cent, could not be forfeited and retained by the United States, there would be still less grounds for retaining the entire price of a portion of the material. If the circumstances had justified or allowed the forfeiture, it was limited specially and expressly to the ten per cent, in any event. For the material, therefore, which has been delivered and not paid for, viz., seventy-five cords of stone, forty of which were delivered at the point, and thirty-five on the wharf, the claimants must be allowed at the contract price of seven dollars and ninty-four cents per cord, amounting to the sum of five hundred and ninety-five dollars and fifty cents, (#595 50.)
3. We do not find that the claimants are entitled to any damages for the rescission of the contract. It does not follow, that because the circumstances did not justify a forfeiture, or because the right to enforce it was waived, that the United States could not put an end to the contract, for repeated and continued delays and failures on the part of the claimants. We think, after the time for the fulfilment of the contract had elapsed, and delay and failure still occurring, the officer in charge of the work, while he might not enforce the punishment of forfeiture, (that having been waived,) would have the right to protect the interest of the government and facilitate the work, by refusing to have its progress dependent upon contractors upon whose promptness and ability he could not rely. And we are of opinion that the causes for which the officer declared the contract at end, and refused to receive the remainder of the material, were sufficient, and furnish no ground for any claim of damage against the United States.
We therefore find the plaintiffs entitled to recpver as follows :
Retained percentage.............................. $1,322 93
Stone delivered................................. 595 50
1,918 43
And now, to wit, March 7, 1864, the court, upon due consideration of the premises, do find in favor of the claimants, and do order and adjudge that they recover of and from the United States the sum of nineteen hundred and eighteen dollars and forty-three cents. And as to all other matters and claims in said claimants’ petition contained, they do find in favor of defendants.
BY THE COURT.